Mr. Andrew. Good morning, your honors. May it please the court, my name is Frank Andreo. I represent Joseph Reed in this matter. He is a plaintiff appellant and this is essentially a discrimination case that was dismissed on summary judgment. And in the limited time that I have before the court today, I would like to ask the court to review the district court's decision and employ a test that we believe is more indicative of what should have been applied, and that is the Ortiz analysis, which we're not claiming changes the We're asking the court to consider whether the evidence presented to the district court would allow the fact finder to conclude that the plaintiff's race or other prescribed factor caused the adverse action, which in this case we're claiming was a discharge. So let me just ask you this, one of the things you want us to draw as an adverse inference from FMC's failure to provide Reed with attendance records, right, of the non-African-American brokers, but Reed never specifically requested the attendance records for any of Reed's co-employees. But we did. In a very broad, general sense, you asked for records, but it was never tailored, your discovery request, right? We requested the personnel files of those individuals, which like Reed's, would have had the attendance records in them. Pursuant to the defendant's testimony by Ms. Bidstrup and the personnel director down in Indianapolis, all of these records are in one place, and that is their file. And so did you meet and confer with FMC about those documents and then file a motion to compel if you didn't get what you needed? Well here's, no, the direct answer is no, and here's the issue. So that's a problem. Well it can be, but if I may explain one thing, Your Honor. What we have an issue with here is if we ask the defendant, and sometimes myself I do defense work, you have a defense and that is, well, everybody was applied to the same standard. And I say, well, show me those records. And they say no. How far do I have to dig in order to give them the evidence to have damage done to my case? And that's the issue. If they don't want to give their strongest evidence to me, that's fine. Then we're stuck with the record the way it is. And what I have... Well no, you're not stuck, because you can always come to the court and refuse your request, and it's a reasonable request to get the district court to order them under a motion to compel to provide the documents. Right, and then if not, I can use the inference if they don't want to produce those records. Right, but you never went through those steps, right? You never filed a motion to compel. Was our position, Your Honor, that we didn't need to do that because the inference was a negative one. Those records, and this is the other part of it, if we're alleging that Ms. Bidstrup was the one who was in control of the attendance procedure and enforcement, and she was applying it in a discriminatory manner towards Joseph Reed, Felicia Bates, and another African-American broker liaison, Cynthia Hubbard, she wouldn't have made those marks in the record anyway, and she wasn't. And the reason that we know that is because we went through the depositions of Reed, of Bates, we also the supervisor, and we also deposed Bidstrup. Getting back to this negative inference, though, that was never raised before the district court either, the fact that they had refused and therefore the district court should draw a negative inference. Not until we filed the response to the motion for summary judgment. We did bring it there. And so... Did employees literally clock in? Was there a timekeeping system that recorded arrival and departure? Not to my knowledge, and what essentially what we have are the three individuals, as we stated in our briefs that we've shown in the record, were required to show up at 8 o'clock in the morning, and the only three that were sitting there were the African-American employees. They took these videos of the clock on the wall, they took, they tried to take the video of the computer clock itself to show that there wasn't anybody there at 8 o'clock besides them. So there was one set of rules for the non-black employees and another set of rules... Well is that clear, or isn't there some evidence that these white employees worked later, to six instead of five? That policy was the way it was for everyone before those two emails were sent out, Your Honor, and that was our contention. There were two emails sent out, one on January 21st of 2013 and a second one on April 9th of 2013, which basically states the hours of operation are from 8 to 5, and that's it. And everyone is required, and it wasn't just the broker liaisons who were given that admonishment. That email went out to everyone at the Downers Grove facility. But apparently a lot were working 9 to 6. They were, and that would have been... Which is the same amount of time, and why would 9 to 6 be considered superior to 8 to 5? The point is, Your Honor, if my employee, my client didn't show up at 8 o'clock, he was disciplined. If the other employees who were also required to show up at 8 o'clock, they were disciplined. That was an arbitrary policy. But it isn't so clear that they were required to show up at 8 o'clock. If, in fact, they worked for 9 to 6, that's, of course, the same amount of time, and why... So, their dinner gets... They have to... They can sleep a little longer, but their I don't know why that's a superior workday. I'm not sure that that's really what the point was about whether it was a superior workday or not. The point that I believe Cheryl Bistrop was trying to make at her deposition was that eventually everybody was setting hours. Some people were coming in at 10. Other people were skipping lunch. They weren't taking their breaks, and then they would leave early. Cheryl Bistrop stated she wanted uniform hours, 8 to 5, and she put it in two emails. But what about all these people who were working 9 to 6? Apparently, they were in violation of the Bistrop policy, but they were not disciplined for it, and that's part of the problem that we have. Why weren't they disciplined? Well, we're arguing because they weren't African American. Well, I don't understand that. Well, here's basically... Even if the employer likes white people more than black people, he does want those white people to work. He's paying them. Right, absolutely. I thought they were working 9 to 6 instead of 8 to 5. They were up to a point, and that's when these emails came out, and everyone was then set to work 8 to 5 unless they received permission. And the only time that that permission was allowed, according to Cheryl Bistrop, was if there was a different time zone that they were involved in. Some accounts were in Michigan where they're an hour ahead or something like that. Otherwise, everyone was required to work 8 to 5. It's the end result that I want to focus on, and that was when we come to the termination. Well, how much do we know about the people working 9 to 6? Were they all people who were in different time zones from the other people, or what? That I don't know. I think there was only one person that was allowed that I'm aware of after this policy was put in place that was actually still working 9 to 6, if my memory serves me. And I do believe that individual was not only working 9 to 6, but also working from home because they had accounts in a different time zone. That's according to Cheryl Bistrop. Everybody else was required to show up at 8 and leave at 5. It wasn't as though this policy was always... Well, the person you just meant, the people who work in the... who live in a different time zone, their starting later is not... you're not saying that's racist, are you? No, not at all. I mean, that is something that has to be done. And they're still working in the Downersville branch. So who were the white people who were favored by having different hours? The different hours is not how they were favored. It was the enforcement on when they weren't at work or they were late that we have a problem with. For example, there was an employee by the name of Landis who was a white female who was absent from work for four days and was incarcerated and did not suffer any adverse consequence. That was brought up in a March 16 mail... She was in jail, you said? She was in jail. Yeah. That was brought up by Felicia Bates, and it was basically relayed down to Indianapolis to the personal department by Cheryl Bidstrup when that complaint was made, and they basically said, just paper the file, don't worry about that. But that's an example. Now, Joe Reed had to take time off because he had a child with special needs. He wasn't allowed to work from home. And these were things that were saying where the rules were not applied equally, and that was basically the basis for the determination that they state was simply, well, he had the most violations of any of the other employees, and that's simply not true. I see my time has expired. Okay. Well, thank you, Mr. Andrew. Thank you. Mr. Perlman? Good afternoon, Your Honors. My name is Stephen Perlman on behalf of Freedom Mortgage Corporation. May it please the Court, we think that in every respect Judge Zagel's opinion was spot on. But before I get into any of the details, I think it's important to provide some context surrounding this case. This was a short-term employee, Mr. Reed. He unequivocally admitted in his deposition that within a four-month period, he violated the attendance policy 19 separate times. This is someone who flagrantly flouted this policy. He was let go in a reduction in force. The reasons that were given, which are in Judge Zagel's written opinion, which are uncontested, is that he had the lowest seniority of a broker liaison, and he had written discipline on his record for violating the attendance policy, which followed verbal discipline. And following that, he continued, as admitted in his deposition, to flagrantly violate the policy in a wanton manner. Now, I would like to know why his observations of the late arrivals and absences of other employees are not sufficient to establish lateness and absence on summary judgment. Do we ever require corroboration for personal observation? Judge Rovner, I think it's very important to note that while a plaintiff could say, look, I saw everybody absent all the time, and I'm the only person who showed up, there's no actual evidence of that. There's no time cards. There's no attendance records. There's no evidence, most importantly, critically, most importantly, that the decision makers, Bistrop and Sperry, But doesn't that get the burden of persuasion backwards? In other words, we've got management setting office hours at 8 to 5. Certain white employees came in after 8, were not disciplined. Isn't it the employer's burden at that point to demonstrate that the white employees were not really late because they had permission to work a different schedule? I mean, that seems like a defense, not part of his prima facie case. Your Honor, we would respectfully submit as part of his prima facie case on a summary judgment context, Mr. Reed would need to establish that similarly situated individuals who are not African American, who are broker liaisons, were not complying with the policy itself. He doesn't have any of that evidence to support that. But what is more, you have the evidence that's unrebutted of Sperry and of Bistrop, both of whom were the decision makers. And they said, look, first of all, there's nobody who came remotely close. And this isn't hyperbole. They were very clear in their statements. They said there's nobody who is remotely close to the number of violations that Mr. Reed had, number one. Number two is that the only evidence that Mr. Reed purports to point to in his case, and on summary judgment, and here today, is Nicole Landis as a comparator. Now, let's take a look at Nicole Landis. Nicole Landis did miswork. Now, Sperry and Bistrop testified unequivocally and without any rebutting testimony that that one individual misworked on one occasion. Now, Mr. Reed's counsel says, well, she was in jail. Well, who cares why she was missing work? The policy says that's irrelevant. He says she misworked for four different days. Well, look at the policy. The policy itself says that you can have consecutive days, and they count as one occurrence. So that's one occurrence. You have one comparator. Now, let's say Mr. Reed is correct that she had four absences here. First of all, she got a warning. That's uncontested. Number two is that he had 19 absences, and they kept occurring after each time that he got a verbal warning and a written warning. So we think that that's apples and oranges, Your Honor. What had she been arrested for? It was a domestic incident is all I got out of the record. I think that there was, from what I can glean from it, some dispute with her husband that landed her in jail. Judge Rovner, may I continue? Sure. Yeah. I'd like to address. I'm sorry. I don't want to talk over you. I said yes, and then, of course, I didn't let you. I think, you know, I guess the real question is whether his personal observations are enough to shift the burden to you as the employer to demonstrate why the different incidents aren't indicative of a double standard for whites and blacks. Your Honor, one more thing that I would point to in addition to the points that I had made previously is that this Court in the Harper v. C.R. Engineering case made clear that where a plaintiff has the type of case that we see here, disparate enforcement of an attendance policy, if they don't proffer the attendance records to the district court, they cannot establish a prima facie case. I think that this Court has addressed that issue already. I think what the plaintiff tries to do is sort of a default, and in our brief, we think that this is, we call this a default argument, and I think it is, is he says, look, we recognize that we don't have any evidence, but we think we can establish a prima facie case because we have no evidence. And so that turns the jurisprudence in the Seventh Circuit and the law all over the country upside down and on its ear. In essence, they're relying on the international union case, which made very clear in a caveat that if you have the burden of proof, you can't rely on the absence of evidence to establish your burden of proof. And plus, of course, before the district court, they had multiple ways of trying to get any evidence that they needed to support their case. Now, what Mr. Andreu told you he requested in his discovery request is actually not correct. Number one is that they did not request attendance records. I have the interrogatories and the document requests here, and I've read them. They don't request attendance records. He says instead, well, we requested personnel records. Actually, they did not. They did not. We reviewed those discovery requests on multiple occasions, and they're entirely missing. So what Mr. Andreu's argument is, look, I didn't prosecute my case. I didn't look for attendance records in a disparate enforcement of attendance policy case. I didn't do the most fundamental thing that I could have done, and I want you to reward me for that by allowing me to survive summary judgment because the other side didn't put forth evidence negating part of my prima facie case. It was his burden, and there was no effort in discovery whatsoever. That is consistent with a failure to depose two different decision makers. Now, I think as far as Mr. Andreu's argument concerning the Ortiz case is concerned, first of all, I think Ortiz is a very insightful, well-decided case, and I think Judge Zagel felt the same way. Judge Zagel, in his discussion of the relevant legal standard, essentially said Ortiz is the standard. He may not have cited the Ortiz case itself, but he said, A plaintiff may proceed via the direct and indirect method as laid out in McDonnell-Douglas. No matter how the plaintiff proceeds, the Seventh Circuit is warned that although courts may get lost in the technical nuances of the two methods, the central question at issue is whether the employer acted on account of the plaintiff's race. That's Ortiz. Now, what Judge Posner did further is he said, I'm applying the McDonnell- Douglas case. He was implicitly clear in saying McDonnell-Douglas survives the Ortiz analysis, but he did even more than that. He took a step back and he recounted all of the undisputed facts that would bear on whether or not there's race discrimination, and that's what the Plaintiff's Counsel hasn't addressed in this particular case. I think Judge Zagel was on all fours with what the Ortiz decision required him to do. I'll defer to the Court if there's any other questions, and thank you for the opportunity to present our case. Thank you, Mr. Perlman. Thank you. Mr. Andrew, do you want to go further? Just briefly, in the minute or so I have left, we also had shown that there were four employees that were constantly late, Bakir, French, Landis, and Kluck, who were Caucasian females. The Ortiz, just real quick, the Ortiz. You say four of them were? They were all Caucasian. No, no, I understand. But they were late? Chronically late. How often? How frequently? Well, I believe that Ms. Bates had testified that Bakir was late on a daily basis for periods of time, and then Joe Reed had observed. Was a reason given? No, no reason was given, and there was no indication that there was ever any discipline or suspension, and she was frequently late as well. Now, Ortiz doesn't state, and I didn't mean to imply that. Did you question any of these people? Ortiz or, I'm sorry, Bakir or French? No, Your Honor. Well, you said there were these four people who had bad attendance records. Did you find out why they were absent? No. I mean, you know, people can get sick and then they miss work for several days. Sure, but not as frequently as Bakir on a daily basis. Pardon? Well, this was on a daily basis. What do you mean on a daily basis? Bates testified that she observed Bakir coming in late five days a week. Five days in one week or five days every week? Five days in one period, five days in one period. But we don't know why she was absent for that week? No. And counsel's characterization of your discovery, you can't dispute that, right? No. Okay. Well, thank you very much to both counsel. And the court is going to take a ten-minute recess before we hear the fourth argument.